IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RICHARD GRUSS, PEGGY COOK,
GERALD HERMANSON, for themselves
and all persons similarly situated, and
UNITED FOOD AND COMMERCIAL
WORKER'S LOCAL UNION 538,

Plaintiffs,

v.

KRAFT HEINZ FOODS COMPANY, INC.,

Defendant.

OPINION AND ORDER

15-cv-788-wmc

In this putative class action, plaintiffs Richard Gruss, Peggy Cook and Gerald

Hermanson, as well as their union United Food and Commercial Worker's Local Union

538, allege that defendant Kraft Heinz Foods Company, Inc.[1] violated the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, when it

terminated retiree health care benefits.  Defendant originally filed a motion to dismiss

arguing that the health care benefits at issue were not vested rights, and therefore

plaintiffs' complaint failed to state a claim for relief.  (Dkt. #8.)  In an earlier opinion,

the court converted that motion to a motion for summary judgment, while providing

plaintiffs an opportunity to conduct discovery and then directing the parties to meet the

court's filing obligations for such a motion.  (Dkt. #29.)  With the benefit of an

evidentiary record -- particularly, authenticated collective bargaining agreements that set

forth the scope of the three named plaintiffs' benefits -- the court finds as a matter of

---

[1] Consistent with defendant's representation, the court has changed the docket to reflect the
correct name of defendant Kraft Heinz Foods Company, Inc.

binding caselaw interpreting ERISA that the plaintiffs have no vested right to health care benefits upon retirement. Reluctantly, therefore, the court must enter summary judgment in defendant's favor.

UNDISPUTED FACTS[2]

**A. The Parties**

Defendant Kraft Heinz Foods Company, Inc. is a Pennsylvania corporation, with deep, historic operations in this judicial district, including a prominent meat processing plant in Madison, Wisconsin, where food products were made and sold under the "Oscar Mayer" brand name, though the factory has now closed.[3]

Plaintiff United Food and Commercial Worker's Local Union 538 is a labor organization affiliated with the United Food and Commercial Workers International Union. Individual plaintiffs Richard Gruss and Gerald Hermanson were hourly employees at the Oscar Mayer plant until they retired; plaintiff Peggy Cook's deceased

---

[2] In response to the converted motion for summary judgment, plaintiffs filed their own proposed findings of fact, most of which defendant subsequently disputed. While the briefing schedule did not contemplate a reply, plaintiffs filed a motion for leave to file a reply in support of their proposed findings. (Dkt. #45.) Given defendant's responses and to ensure plaintiffs have been provided with every opportunity to develop the evidentiary record, the court grants that motion and has considered plaintiffs' reply in setting forth the following facts.

[3] *See generally* "Oscar Mayer," Wikipedia, https://en.wikipedia.org/wiki/Oscar_Mayer (describing the founding of Oscar Mayer & Co. in 1906, purchase of processing plant and move of headquarters to Madison, Wisconsin in 1919, sale of business to General Foods in 1981, merger with Kraft Foods Inc. in 2001, and Kraft's announcement to close Madison plant in 2015). Kraft Foods Inc. merged with H.J. Heinz Company, effective July 2, 2015, creating defendant Kraft Heinz Foods Company, Inc. *See* "Kraft Foods," Wikipedia, https://en.wikipedia.org/wiki/Kraft_Foods. For ease of reference in this opinion, the court refers to defendant and earlier entities for whom the defendant acknowledges legal responsibility simply as "Kraft."

husband, Eldon Cook, was also an hourly employee at the Oscar Mayer plant until he retired.

While employed at the Oscar Mayer plant, Gruss, Hermanson and Eldon Cook each was represented for purposes of collective bargaining by the Union, and the terms and conditions of employment for each were governed by a series of collective bargaining agreements ("CBAs") between the Union and Kraft. The three individual plaintiffs seek to represent a class consisting of all former Local 538-represented employees who are participants in the Kraft retiree health and prescription drug insurance plans and who are age 65 and older.

The collective bargaining relationship between the Union and Kraft and its predecessors began in the late 1930s.[4] In light of the timing of their retirements, the three named plaintiffs' claims are governed by different CBAs. Because Gerald

---

[4] Plaintiffs also represent that "[s]ince at least the 1960's, active employees covered by the CBA's between Kraft Heinz and Local 538 who retired have continued to receive the same health insurance in effect at the time they retired until their death and the death of their spouses." (Pls.' PFOFs (dkt. #38) ¶ 1.) In support, plaintiffs cite the declaration of Douglas Leikness, the current Union President. (Leikness Decl. (dkt. #13) ¶ 18.) Defendant contends that plaintiffs have failed to establish that Leikness has "sufficient personal knowledge to testify to the proposed facts that relate to information from decades ago." (Def.'s Resp. to Pls.' PFOFs (dkt. #43) ¶ 1.) In support, defendant points to Leikness's deposition testimony that he had no role in CBA negotiations before 2004. (Leikness Depo. (dkt. #36) 31.) Defendant repeats this challenge with respect to other parts of Leikness's declaration, which similarly concern the historical treatment of retirees' health care benefits, and it filed a motion to strike those paragraphs of Leikness's declaration. (Dkt. #20.) In response, plaintiffs explain that Leikness has been a member of the bargaining unit at issue for over 30 years, is competent to testify about communications he received during this period, and conducted an "independent review of the bargaining history." (Pls.' Opp'n (dkt. #22) 2.) The court finds plaintiffs provided an adequate basis to consider Leikness's averments, at least for purposes of summary judgment, and therefore will deny the motion to strike. For reasons explained below, however, his statements still constitute extrinsic evidence, which the court may only considers if there is an ambiguity in the CBAs and related documents.

Hermanson retired September 1, 1990, the 1989 CBA governs his claims. In contrast, Richard Gruss retired October 1, 2002, making the 2000 CBA operative for his claims. Finally, Eldon Cook retired on May 1, 2008, meaning the 2004 CBA governs the claims of his wife Peggy.

### B. Documents Pertinent to Plaintiff's Claims

#### i. 1989 CBA and related documents[5]

The 1989 CBA governed the period from August 28, 1989, to September 6, 1992. In a section entitled "Pensions and Insurance," the 1989 CBA states that "Health Care Benefits For Retired Employees and Their Dependents as negotiated and amended by the Company and the Union are set forth in separate brochures." (Bobber Decl., Ex. E (dkt. #329) 31.) In prior litigation, the Union representative Joseph Jerzewski testified that the "separate brochures" referred to the summary plan for "Pension Plan No. 1." (Def.'s PFOFs (dkt. #30) ¶ 61 (citing Jerzewski Depo. (dkt. #33) 46-47).) In this litigation, another Union representative Michael Rice testified that "separate brochures" language in the 1989 CBA refers to the summary plan descriptions. (Pls.' Resp. to Def.'s PFOFs (dkt. #37) ¶ 61 (citing Rice Depo. (dkt. #35) 64).) Plaintiffs further contend that Jerzewski's prior testimony was in error. (*Id.*)

Regardless, the parties did not negotiate over healthcare benefits for retired employees before entering into the 1989 CBA. When Kraft and the Union negotiated the 1989 CBA, the parties initially documented the negotiated terms in a memorandum

---

[5] The 1989 CBA is available at Bobber Decl., Ex. E (dkt. ##32-9 to 32-10). The document is also identified as Exhibit 7 to the Union depositions.

of agreement ("MOA") before revising the CBA itself, consistent with regular practice. (Bobber Decl., Ex. E (dkt. #32-10).) The parties' 1989 MOA, like the 1989 CBA, specified that it remained in effect through midnight, September 6, 1992. (*Id.* at 6.) The 1989 MOA specifically references medical benefits for retirees in Section 10.D, which provides:

> D. <u>Retiree Medical Benefits</u>
>
> 1) All Retirees who retired after 10/1/85 and before 9/1/86 shall have their Medial Benefits increased to the 1987-89 Retiree Medical Plan level for claims incurred on or after 9/1/89. This new Retiree Medical Insurance Plan is designated Plan 011. All future Retirees will be covered under Plan 011.
>
> 2) Employees who retire after 2/1/92 will share the cost of Retiree Medical coverage. (Details are provided in Attachment Q.)

(*Id.* at 4.) Without disputing this language, plaintiffs contend that "Attachment Q in the 1989 MOA contains further agreements regarding retiree health care benefits." (Pls.' Resp. to Def.'s PFOFs (dkt. #37) ¶ 66.) However, plaintiffs fail to explain *how* Attachment Q is material to their claims, other than point to language that describes how annual premiums are calculated "in succeeding years." (*Id.* at ¶ 67.). From the court's review, Attachment Q describes premium contributions due from retirees. (Bobber Decl., Ex. E (dkt. #32-10) 18.)

The Union also produced the brochure of Plan 011, referenced in the CBA. (Bobber Decl., Ex. K (dkt. #32-25).) Defendant contends that there is no language in that document that promises to provide medical benefits to retirees that would continue beyond the termination of the CBA in effect when the individual retired or that the

medical benefits could never be changed. (Def.'s PFOFs (dkt. #30) ¶ 69.) Plaintiffs dispute this, directing the court to the following language:

> 4. When member retires:
>
> Coverage for retired Hospital, Medical and Surgical Outpatient Diagnostic, Optical Care, Prescription Drug provided through the company indemnity plan at company expense. If an employee is a member of an HMO[,] they may continue their HMO coverage after retirement.

(*Id.* at 4.)

### ii. 2000 CBA and related documents[6]

The 2000 CBA covers the period from July 7, 2000, to March 1, 2004. (Bobber Decl., Ex. E (dkt. #32-7) 30.) In a section entitled "Pensions and Insurance," the 2000 CBA states that "Effective January 1, 2001, the current medical plan will be converted to the Kraft Choice Plan." (*Id.* at 28.)

During negotiations leading up to the 2000 CBA, Kraft had proposed converting all existing medical coverage to the "Kraft Choice Plan." During those negotiations, and before any agreement was reached, Kraft also gave the Union the summary plan description ("SPD") for the Kraft Choice Plan. In particular, all the members of the Union's bargaining committee received a copy of the Kraft Choice SPD before entering into the 2000 agreement. As described above, the Union agreed that the Kraft Choice Plan would be the only medical coverage option offered to the active employees effective January 1, 2001. As a result, if an employee chose to retire during the term of that CBA,

---

[6] The 2000 CBA is available at Bobber Decl., Ex. E (dkt. ##32-6 to 32-8). The document is also identified as Exhibit 4 to the Union depositions.

2000-2004, the individual would be offered coverage under the Kraft Choice Plan in retirement.

The Kraft Choice SPD includes a specific section entitled, "Retiree Coverage." (Bobber Decl., Ex. E (dkt. #32-12) 28-30.)[7]  A sub-section, entitled "When Retiree Coverage Ends," states:

> Your coverage will end on the earliest of these dates:
>
> - The end of the period for which you last made the required contribution, if you stop paying your share of the plan's cost
>
> - The date of your death (Coverage for your surviving spouse will continue provided contributions are made.) or
>
> - The date the plan is terminated.

(*Id.* at 30.)

The SPD also contained a section entitled "Right to Amend or Terminate the Plan," which states:

> Kraft Foods, Inc. or its Management Committee for Employee Benefits reserves the right to amend or terminate the Kraft Medical Plan at any time, subject to the provisions of any applicable collective bargaining agreement or as required to comply with applicable federal law or regulations. In such a case, you will be properly notified of any changes, and all changes would be subject to the plan's provisions and applicable laws.

(*Id.* at 35.)

Plaintiffs point to language in the same document, which states that:  "The amount you pay towards the cost of retiree medical coverage depends on your years of

---

[7] The Kraft Choice SPD is also referred to as Exhibit 7 to the Union depositions.

service with the company when you retire. You pay a percentage of the plan's annual cost. Contributions are adjusted on January 1 based on the preceding year's cost." (*Id.* at 28.) Plaintiffs also point to an SPD effective January 1, 2001, which provides that retiree health care premium contribution "rates for this coverage are as negotiated." (Def.'s Mot. to Dismiss, Ex. D (dkt. #9-6) 70.)

When Kraft Heinz and the Union negotiated the 2000 CBA, the parties initially documented their agreement in a MOA prior to revising the actual CBA document, again consistent with their regular practice. (Bobber Decl., Ex. # (dkt. #32-11).)[8] Like the 2000 CBA, the parties' 2000 MOA contemplated the CBA would remain in effect through midnight, March 1, 2004. (*Id.* at 7.) The 2000 MOA also referenced retiree medical coverage as follows:

- For employees who retire during the term of this agreement and on or before 01/01/04, Retiree Medical Premiums for health insurance will remain at the active employee rate which is in effect at the date of retirement.

- Retirees will have annual enrollment options in accordance with the Kraft Choice plan.

(*Id.* at 4.)

### iii.    2004 CBA and related documents[9]

The 2004 CBA covers the period from March 1, 2004, to December 10, 2009. (Bobber Decl., Ex. F (dkt. ##32-19) 12.) In a section entitled "Pensions and Insurance,"

---

[8] The 2000 MOA is also identified as Exhibit 15 to the Union depositions.

[9] The 2004 CBA is available at Bobber Decl., Ex. F (dkt. ##32-17 to 32-20). The document is also identified as Exhibit 3 to the Union depositions (Rice and Leikness).

the 2004 CBA states that "Effective January 1, 2001, the current medical plan will be converted to the Kraft Choice Plan." (*Id.* at 9.) However, the 2004 CBA itself contains *no* reference to retiree medical benefits. The only reference to those benefits in the 2004 CBA is found in Appendix D, which states:

> Health Care Benefits are found in a separate document.
>
> . . .
>
> Retiree Medical coverage will not be provided for those hired after 12/1/04.

(*Id.* at 21.)

The SPD for medical benefits applicable during the entire 2004 CBA was entitled "Kraft Heinz Foods Global, Inc. Medical Plan and EAP SPD" ("2004 SPD"). (Bobber Decl., Ex. F (dkt. ##32-15 to 32-16).)[10] The 2004 SPD contains a section entitled "Retiree Coverage (if eligible)." (Bobber Decl., Ex. F (dkt. #32-16) 23-25.) A sub-section, entitled "When Retiree Coverage Ends," provides:

> Your coverage will end on the earliest of these dates:
>
> > The end of the period for which you last made the required contribution, if you stop paying your share of the plan's cost
> >
> > The date of your death (Coverage for your surviving spouse will continue provided contributions are made.)
> >
> > The date the plan is terminated
> >
> > OR
> >
> > The date retiree coverage under the plan is terminated.

---

[10] The document is also referred to as Exhibit 25 to the Union depositions.

(*Id.* at 25.)

The SPD also contained a section entitled "Right to Amend or Terminate the Plan," which provides:

> Kraft or its Management Committee for Employee Benefits reserves the right to amend or terminate the Kraft Foods Global, Inc. Group Benefits Plan at any time for any reason, subject to the provisions of any applicable collective bargaining agreement or as required to comply with applicable federal law or regulations. In such a case, you will be properly notified of any changes, and all changes would be subject to the plan's provisions and applicable laws. Keep in mind, health care benefits do not vest like retirement plan benefits. That means you do not have a guaranteed right, at any time, to receive plan benefits.

(*Id.* at 37.) Plaintiffs also produced various booklets, containing SPDs, in response to defendant's discovery request, all of which contain a "Right to Amend or Terminate the Plan" section, which provides the same quoted language as above. (Def.'s PFOFs (dkt. #30) ¶ 31 (citing Bobber Decl., Ex. H (dkt. #32-22) 70; *id.*, Ex. I (dkt. #32-23) 75; *id.*, Ex. J (dkt. #32-24) 61).)

The 2004 MOA specified that this new CBA would terminate on December 10, 2009. (Bobber Decl., Ex. F (dkt. #32-14).)[11] The 2004 MOA referenced medical coverage generally as follows: "Maintain benefit levels in effect 1/1/04 for the life of the contract." (*Id.* at 2.) As for retiree medical benefits, the 2004 MOA provides:

- Retiree Medical eliminated for those hired after 12/1/04
- Retiree Medical options and contribution same as active at time of retirement

---

[11] This document is also referred to as Exhibit 23 to the Union depositions.

- Company and Union may agree to self-funded medical in the future

(*Id.* at 3.)

## C. Recent Changes to Retiree Health Care Benefits

Overtime, Kraft has provided health and prescription drug insurance to employees and retirees represented by local 538 in accordance with the terms of its CBAs. Under those terms, plaintiffs similarly paid the same premium contributions in retirement that they paid when they were active employees. By letter dated September 2, 2015, however, Kraft notified plaintiffs and other retirees that effective January 1, 2016, their current retiree health and prescription drug insurance plans would be terminated.

For certain retirees, Kraft also provided the option of participating in OneExchange, a privately-operated Medicare insurance exchange. To participate in the OneExchange program, however, retirees would be required to pay out-of-pocket all premiums and other costs of supplemental Medicare health and prescription drug insurance, with Kraft representing that it would make annual contributes to each participating retiree's health reimbursement account ("HRA") in an amount equivalent to the cost of obtaining equivalent health and prescription drug coverage. Plaintiffs allege that "[a]t some point, even with the HRA, the amount of premium contributions OneExchange Subclass members pay will exceed the amount of premium contributions they currently pay." (Compl. (dkt. #1) ¶ 24.)

Other retirees covered by health and prescription drug insurance plans sponsored by Aetna Life Insurance Company and its affiliates were given the option of enrolling in

the Aetna Medicare Advantage Preferred Provider Organization with Extended Service Area, a Medicare plan available under Part C of Medicare. Under the Aetna Medicare plan, a retiree would be required to pay up to $2,000 per year for co-pays and co-insurance, an additional charge not required under any of the plaintiffs' earlier CBS plans. Also under the Aetna Medicare plan, spouses and eligible dependents are *not* covered.

Kraft did not negotiate with the Union about these changes, and the Union did not agree to the termination of the prior health and prescription drug plans. Accordingly, plaintiffs allege that these unilateral changes in health insurance coverage constitutes a breach of the applicable CBA and a violation of ERISA, 29 U.S.C. § 1132. Both claims rest on plaintiffs' contention that plaintiffs have vested rights to receive the pre-2016 health and prescription drug insurance coverage. (Compl. (dkt. #1) ¶¶ 36, 40.)

### D. Prior Litigation

In 2011, the Union and other retirees (presumably including Gruss and some other members of the putative class as currently defined here) sued Kraft in this court, alleging claims to vested retiree medical benefits that were similar to the claims here, although they concerned others changes to the retiree health care plans occurring in October and November 2010. *Bauer v. Kraft Foods Global, Inc.*, No. 11-cv-15-bbc (W.D. Wis. Jan. 7, 2011). The plaintiffs in that case narrowed their claims to only those persons who retired during the term of the 2000 CBA. Judge Crabb certified a class, but granted summary judgment to defendant, finding that the 2000 CBA did not foreclose the two challenged changes to health care benefits. *Bauer v. Kraft Foods Global, Inc.*, 277

F.R.D. 558 (W.D. Wis. Feb. 15, 2012) (granting motion for class certification); *Bauer v. Kraft Foods Global, Inc.*, No. 11-cv-15-bbc, 2012 WL 3962907, at *5 (W.D. Wis. Aug. 7, 2012) (granting summary judgment to defendant). In so finding, Judge Crabb assumed, without deciding, that the benefits were vested and opted to address the specific challenges. *Bauer*, 2012 WL 3962907, at *3.

For this reason, the opinion did not reach, nor does it necessarily estop, plaintiffs' challenges here, but certain statements made by the Union during the course of that litigation bear on the claims it asserts here. In particular, during the September 7, 2011, deposition of the Union's then President and Business Manager, Joseph Jerzewski was asked if the 2000 CBA contained "any language . . . that the Union contends obligates the Company to provide a retiree medical benefit?" (Jerzewski Depo. (dkt. #33) 60:14-16.) He responded, "Not in this document." (*Id.* at 60:17.) Jerzewski provided the same testimony with respect to the 2004 CBA. (*Id.* at 82:18-25 ("Q. Is there any language in the labor agreement that you can point to that confirms that the Company has an obligation to provide retiree medical benefits? A. Other than past practice and what has been provided for many years to our members. Q. Other than that, not CBA language? A. Correct.").)

OPINION

The ultimate, substantive issue in this case is whether plaintiffs' claimed health care benefits survived the termination of the CBAs. As a question of contract interpretation, the answer is a matter of law absent some ambiguity in the CBA and plan

documents. *See Barnett v. Ameren Corp.*, 436 F.3d 830, 833 (7th Cir. 2006) ("As this issue is essentially one of contract interpretation, it lends itself to resolution by summary judgment because while any disputed facts are settled in the nonmovant's favor, the determination of whether a contract is ambiguous is a matter of law."); *see also Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542 (7th Cir. 2000) (relying on the language of CBAs to affirm grant of summary judgment to defendant).

The parties agree that the benefits at issue are welfare benefits governed by ERISA, 29 U.S.C. § 1001. *See Rossetto*, 217 F.3d at 541-42 (internal citations omitted). Contrary to the natural assumptions of many, if not most, employees, and frankly a basic sense of fair play, "[e]mployers are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). This is because unlike pension benefits, ERISA does not *mandate* the vesting of welfare benefits. *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 814 (1992); *see also Barnett*, 436 F.3d at 832. Rather, "employers and unions may *choose* to enter agreements for welfare benefits to vest[.]" *Senn*, 951 F.2d at 814 (emphasis added).

Unfortunately for plaintiffs, the Seventh Circuit has established a series of guideposts to which this court must adhere in determining whether a benefit has vested under ERISA, which generally raise the bar to assert such an agreement. First, any agreement for the vesting of welfare benefits under ERISA "must be contained in the plan documents and must be stated in clear and express language." *Vallone v. CAN Fin. Corp.*, 375 F.3d 623, 632 (7th Cir. 2004). Indeed, the Seventh Circuit, sitting *en banc* in

14

*Bidlack v. Wheelabratotor Corp.*, 993 F.2d 603, 606-07 (7th Cir. 1993), "established a presumption that an employee's entitlement to such benefits expires with the agreement creating the entitlement, rather than vesting." *Rossetto*, 217 F.3d at 543. To overcome that presumption, the language need not contain the word "vest" or "state unequivocally that it is creating rights that will not expire when the contract expires," *Bidlack*, 993 F.2d at 607, but "silence indicates that welfare benefits are not vested." *Vallone*, 375 F.3d at 632 (citing *Rossetto*, 217 F.3d at 544). Moreover, if the CBAs and the plan documents state that the benefits can be modified or revoked, then the benefits do *not* vest as a matter of law. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995).

Second, a genuine ambiguity -- but not silence -- can eliminate the presumption. An ambiguity is "something that makes it possible to interpret a document reasonably in more than one way." *Rossetto*, 217 F.3d at 542. The Seventh Circuit has recognized two types of ambiguities: (1) a "patent ambiguity" is "apparent just from reading the contract without knowing anything about how it interacts with the world"; and (2) a "latent ambiguity" is "recognized as such only when a contract clear on its face -- clear that is, to the uninformed reader -- is applied to a particular dispute." *Id.* at 542-43.

Third, in determining whether an ambiguity exists, this court is to look at the entire contract to see if either type of ambiguity can be "disambiguated." *Rossetto*, 217 F.3d at 545. This search goes beyond the CBAs to include accompanying plan documents. *See Barnett*, 436 F.3d at 832 ("The second portion of relevant contractual language was contained in a CIPS medical plan."); *Murphy*, 61 F.3d at 564 (reviewing the

CBA and welfare benefits plan incorporated by preference in the CBA); *Senn*, 951 F.2d at 815 (reviewing CBAs and the "insurance booklets").

Fourth, only if there is an ambiguity that is not resolvable elsewhere in the contract and plan documents may the court consider extrinsic evidence to determine the parties' intent. *Vallone*, 375 F.3d at 632-33. For this reason, extrinsic evidence cannot be used to create an ambiguity. *Murphy*, 61 F.3d at 565. Even then, the extrinsic evidence must be objective, not subjective. For example, "[e]vidence is not objective when it is the self-serving testimony of one party to the contract as to what the contract, clear on its face, 'really' means, contrary to what it seems to mean." *Id.* Similarly, testimony that a company official "told the union that retirees had lifetime coverage" was "self-serving, unverifiable, and therefore inadmissible to create a latent ambiguity." *Rossetto*, 217 F.3d at 546; *see also Barnett*, 436 F.3d at 83 (refusing to consider "various recollections and opinions of union representatives"); *Murphy*, 61 F.3d at 568 (holding that "self-serving statements of Keystone employees and Union officials offered to establish their subjective belief that benefits vested . . . is the very sort of subjective and self-serving extrinsic evidence that cannot be used to create ambiguity").

Before applying these guideposts here, the court must first consider what impact -- if any -- the case's posture as a possible class action has on defendants' motion for summary judgment. In their opposition, the named plaintiffs attempt to extend the merits of their claims beyond the three individuals to the hundreds of other putative class members. *See* Pls.' Opp'n (dkt. #11) 1 ("[B]ecause this case is a class action[,] whatever obligations it has to the three named Plaintiffs do not apply to the hundreds of class

members who retired since the early 1980's under a myriad of other contracts and plan documents."); *see also* Pls.' PFOFs (dkt. #38) ¶ 2 ("There are approximately 912 members of the proposed class of retirees. They retired under nine separate CBA's in effect from 1979 to present[.]").) From this, plaintiffs argue that the court must "examine all of the CBAs and SPDs that applied to all class members." (Pl.'s Opp'n (dkt. #11) 12.)

This argument is fundamentally flawed. Until a class is certified, the court only considers the merits of the named plaintiffs' claims. *See, e.g.*, *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) ("[B]ecause until certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs."); *Kremers v. Coca-Cola Co.*, 712 F. Supp. 2d 759, 762 n.2 (S.D. Ill. 2010) ("Controlling authority suggests that a court should address the merits of the claims of the named plaintiffs in a putative class action before addressing any issues about class certification, because class representatives who do not have viable claims jeopardize the interests of the class they seek to represent."). While, hypothetically, there may be other CBAs covering other periods of time that contain language vesting health care benefits -- though that appears unlikely given plaintiffs' obvious efforts to marshal evidence to date (*see, e.g.*, Pls.' PFOFs (dkt. #38) ¶ 26 (citing MOA for 2009 CBA)) -- those CBAs are not before the court.[12]

Even if plaintiffs had sought certification of a class including members subject to other CBAs, the named plaintiffs would not be proper class representatives under

---

[12] Stated another way, the named plaintiffs in this case implicate three CBAs and related documents. The court's inquiry is limited to those documents. The named plaintiffs cannot rest their claims on the hypothetical claims under other, unnamed CBAs to which some putative class members might be subject.

typicality and adequacy requirements, nor more fundamentally, would they have standing to raise claims based on *other* CBAs hypothetically containing language vesting health care benefits. *See Keele v. Wexler*, 149 F.3d 589, 592–93 (7th Cir. 1998) ("To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." (internal citation and quotation marks removed).

With the initial putative class issue aside, the court turns to the language in the three CBAs and related documents that are actually before it for consideration, the 1989, 2000 and 2004 CBAs. Starting with the latter two, neither CBA contains "clear and express" language providing that the health care benefits will continue past the termination of that CBA. *See Vallone*, 375 F.3d at 632. Plaintiffs would point to language describing setting payments of premiums for retirees, but while the court rejects any requirement of "magic" words, this language does not come anywhere near qualifying as clear and express language of vesting.[13] To the contrary, the CBAs themselves are each silent on the continuation of health care benefits for retirees past the agreement, whatever Union representatives or employees claim their expectations may have been.

---

[13] As previously noted in this opinion, plaintiffs are right to argue that the contract need not use the word "vest" (pls.' Opp'n (dkt. #11) 9), but at a minimum there still must be *some* "positive indication of ambiguity" for the presumption to fall out and for the court to look beyond the documents to extrinsic evidence. Plaintiffs' argument notwithstanding, Justice Ginsberg's concurrence in *M & G Polymers USA, LLC v. Tackett*, 135 S Ct. 926, 937 (2015), is of no moment here. As defendant explains, in light of the *Tackett* majority's refusal to address the "clear and express" language standard, Justice Ginsberg's concurrence does not constitute a holding that this court is required to follow, especially in light of the Seventh Circuit's standard requiring the application of that standard. (Def.'s Reply (dkt. #19) 7 & n.1.)

*See id.* (citing *Rossetto*, 217 F.3d at 544 ("[S]ilence indicates that welfare benefits are not vested.")).

Moreover, considering all of the documents, the relevant SPDs both expressly provide a right to "amend or terminate" the health care plan at any time, and the 2004 SPD specifically provides that coverage ends on "[t]he date retiree coverage under the plan is terminated." (Bobber Decl., Ex. E (dkt. #32-12) 35; *id.*, Ex. F (dkt. #32-16) 25, 37.) As described above, if the CBAs and the plan documents provide that the benefits can be modified or revoked, then the benefits do not vest as a matter of law. *Murphy*, 61 F.3d at 565.

The 1989 CBA also contains no clear and express language concerning the continuation of health care benefits beyond the termination of the agreement. With respect to retiree medical benefits, the 1989 CBA simply states that a new plan will govern claims after 9/1/89, and that "[a]ll future Retirees will be covered" under this new plan. (Bobber Decl., Ex. E (dkt. #32-10) 4.) Attachment Q to the CBA sets forth premium contributions from retirees. Unlike 2000 and 2004, however, the 1989 CBA and related documents do not contain an express right to amend or terminate provision, or otherwise provide that the benefits terminate with the agreement.

Finding no clear and express language in the 1989 CBA or related SPD, plaintiffs may attempt to identify an ambiguity in the language of the contracts more generally. Specifically, as described above, plaintiffs point to language: (1) about setting the rates of retirees' premium contributions, (2) that health care benefits continue until the retiree attains age 65 or becomes eligible for Medicare, and (3) about coverage of spouses and

eligible dependents. (Pls.' Opp'n (dkt. #11) 7, 13-14.) Each, plaintiffs' claim, support of their contention that the CBAs clearly contemplated health care benefits continuing into retirement. (*Id.*)

None of this language, taken alone or together, creates an ambiguity as to whether medical benefits vested. As Judge Posner explained in *Vallone*, a "lifetime" welfare benefit is not the same as a "vested" benefit. 375 F.3d at 633. When a plan contains both the promise of a "lifetime" *and* a reservation of rights allowing for termination or amendment of the plan, the "lifetime" promise is construed as "good for life unless revoked or modified." *Id.* The result "in the perhaps beady eyes of the law," as Judge Cudahy so aptly put it, is that "the 'lifetime' nature of a welfare benefit does not operate to vest that benefit if the employer reserved the right to amend or terminate the benefit." *Id.* at 634.

While the 1989 CBA admittedly does not contain an express reservation of rights allowing for the amendment or termination of the plan, plaintiffs' only evidence of a continued right to healthcare benefits after termination of the agreement are still just references in the CBA and accompanying documents to the required premium contributions by retirees in succeeding years. At least under the current state of the controlling case law, plaintiffs fail to point to *any* language that would suggest a lifetime benefit or a benefit until retirees or their spouses reach a certain age. Even the cases cited by plaintiffs, in which courts have found an ambiguity, all involved a "lifetime" or defined period of coverage, coupled with the absence of a reservation of rights provision. *See, e.g.*, *Teeme v. Bemis Co.*, 622 F.3d 730, 737 (7th Cir. 2010) (discussing CBA language providing benefits "until death"); *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 785 (7th

Cir. 2005) (finding ambiguity based on "lifetime" language and distinguishing *Vallone* based on "the absence of a reservation of rights clause" and the strong and explicit "lifetime" language); *Bialoszynski v. Milwaukee Forge*, 419 F. Supp. 2d 1045, 1052 (E.D. Wis. 2006) (finding ambiguity where CBAs contained language about continued receipt of health care benefits until the age of eligibility for Medicare and noting that these provisions involved the same type of ambiguity as in *Bidlack*) (discussing cases). Plaintiffs fail to point to any comparable language in the 1989 CBA or related documents.[14]

Finally, in their proposed findings of facts, plaintiffs point to a course of conduct in an effort to demonstrate vested benefits. As described above, largely through the declaration of the current Union President, Douglas Leikness, plaintiffs contend that "Kraft Heinz consistently recognized this right over 25 years when it agreed to rescind changes made by third parties to these benefits." (Pls.' Opp'n (dkt. #11) 15.) As plaintiffs acknowledge, however, this evidence constitutes extrinsic evidence that the court could only consider if there were an ambiguity in the contract or related documents. Having found none, the court is compelled, as a matter of contract interpretation and ERISA, to conclude that none of the plan documents vest health care benefits past the respective termination dates of each of the three CBAs at issue.

---

[14] Plaintiffs also cite to *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 306 (7th Cir. 1996), as support, but in that case, the court found an "explicit and seemingly unambiguous provision" had vested the plaintiff's health care benefits. There is no such explicit provision at issue here. Plaintiffs also cite to *Stevenson v. Milwaukee Forge*, No. 02-C-00530, 2006 WL 2883256, at *23 (E.D. Wis. Aug. 17, 2006), but fail to explain how the court's interpretation of the term "plans available" furthers their argument here. *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citation omitted).

ORDER

IT IS ORDERED that:

1) Defendant Kraft Heinz Food Company, Inc.'s converted motion for summary judgment (dkt. #8) is GRANTED.

2) Defendant's motion to strike Leikness declaration (dkt. #20) is DENIED.

3) Plaintiffs' motion to file reply to defendant's response to plaintiffs' proposed findings of facts (dkt. #45) is GRANTED.

4) Defendant's motion for leave to file supplemental authority (dkt. #47) is DENIED as moot.

5) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 15th day of September, 2017.

BY THE COURT:


/s/
_____
WILLIAM M. CONLEY
District Judge